UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

DON JOHNSON HAYWARD MOTORS, INC.,
GROSS MOTORS, INC., GROSS CHEVROLET-BUICK-GMC, INC.,
BROADWAY AUTOMOTIVE GREEN BAY, INC.,
SLEEPY HOLLOW CHEVROLET BUICK GMC, INC.,
MIKE SHANNON AUTOMOTIVE, INC.,
SHEBOYGAN CHEVROLET BUICK GMC CADILLAC, INC.,
HERITAGE CHEVROLET, INC., KOCOUREK CHEVROLET, INC.,
KLEIN CHEVROLET BUICK, INC., TOYCEN MOTORS, INC.,
TOYCEN OF LADYSMITH, INC., and A-F MOTORS, INC.,

                    Plaintiffs,

        v.                                     Case No. 16-cv-1350-pp

GENERAL MOTORS LLC,

                    Defendant.

---

**ORDER DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT (DOC. 16), GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT ON COUNTS ONE AND TWO (DOC. 18) AND ALLOWING PLAINTIFFS TO FILE AN AMENDED COMPLAINT**

---

On October 7, 2016, the plaintiffs—licensed motor vehicle dealers in Wisconsin—filed a complaint against defendant General Motors, alleging that the defendant's plans to impose a warranty cost recovery surcharge violate Wisconsin Statute §218.0125. Dkt. No. 1. In addition to seeking a preliminary and permanent injunction (Count One) and declaratory judgment (Count Two), the plaintiffs seek damages for alleged violations of Wis. Stat. §218.0125 and for breach of contract (Counts Three and Four). After mediation failed, the parties agreed to resolve their dispute on an expedited basis, and filed cross

motions for summary judgment. Dkt. Nos. 11 and 13. The plaintiffs ask the court to grant summary judgment on Counts One and Two, dkt. no. 16, and the defendants seek an order dismissing all claims, dkt. no. 18. Because the court concludes that the defendant's proposed surcharge does not violate the plain language of the statute, the court will deny the plaintiffs' motion for summary judgment, and will grant defendant's motion for summary judgment on Counts One and Two.

## I. Findings of Fact

The parties agree to the following facts.

All the plaintiffs are corporations organized under the laws of the State of Wisconsin with principal places of business in Wisconsin, and are licensed as new motor vehicle dealers under the provisions of Wis. Stat. §§218.0101, *et seq.* (the "Act"). Dkt. No. 15 at ¶¶1-13. Defendant General Motors LLC ("GM") is a Delaware limited liability company, which maintains its principal place of business at 100 GM Renaissance Center in Detroit, Michigan, and is licensed as a motor vehicle manufacturer doing business in Wisconsin under the Act. Id. at ¶14.

The defendant manufactures and sells new motor vehicles and replacement parts to independently owned and operated authorized dealers in the United States, who sell or lease vehicles to retail customers and perform repairs and service on the defendant's vehicles. Id. at ¶15. The contractual relationships between the defendant and its dealers are laid out in Dealer Sales and Service Agreements and incorporated Standard Provisions ("Dealer

Agreements") establishing the parties' respective rights and obligations concerning the promotion, sale and service of [the defendant's] vehicles. Id. at ¶¶16-17.

The defendant gives new vehicle retail customers a limited, written warranty covering defects in various parts, systems and accessories. Id. at ¶18. Under the Dealer Agreement, every dealer agrees to perform warranty repairs on qualified vehicles within the warranty period on the owner's request, without charge to the owner, regardless of where the owner bought the vehicle. Id. at ¶19.

In the absence of an applicable statute or regulation, the Dealer Agreement says that the defendant will reimburse its dealers for performing warranty repairs and service in accordance with its Service Policies and Procedures Manual ("SPPM"). Id. at ¶20. Under the SPPM, the defendant reimburses its dealers for the labor provided in warranty repairs, based on an approved hourly rate that the defendant calculates by dividing the total amount the dealer charged its nonwarranty customers for labor by the number of labor hours which the nonwarranty customers were billed. Id. at ¶21. The defendant multiplies that approved hourly rate by the flat rate time allotted by the defendant for each particular repair or service, as provided in its labor time guide ("LTG"). Id. at ¶22. The defendant conducts LTG studies to determine the actual time to complete the repair, plus a markup for performing miscellaneous tasks. The plaintiffs dispute the reasonableness of the defendant's LTG studies. Id. at ¶23.

In addition to providing warranty repairs, the dealers perform nonwarranty repairs on GM and other brands of vehicles, for which they charge their service customers. Id. at ¶24. When performing nonwarranty repairs or service, the dealers typically charge customers based on third-party LTGs that generally allot more time to complete the same repair than does the defendant's LTG. Id. at ¶25. Again, absent any applicable statute or regulation, the defendant reimburses its dealers for parts installed in connection with warranty repairs at a standard markup of forty percent over dealer cost. Id. at ¶26. When performing nonwarranty repairs or service, the dealers typically charge customers a parts mark-up that exceeds the defendant's warranty parts markup of forty percent over dealer cost. Id. at ¶27.

Although *warranty* repairs and service are provided to the consumer at no additional charge at the time of service, their cost represents an expense that must be paid through the revenues that the defendant generates. Id. at ¶28. To be able to provide both warranty and nonwarranty repairs and service, the plaintiffs make investments in service facilities, tools and equipment, training and other items, the costs of which must be paid through the revenues the plaintiffs generate. Id. at ¶29.

Section 218.0125 of the Act allows Wisconsin dealers to request that the defendant reimburse them for parts and labor at their effective nonwarranty retail rates. Id. at ¶30. Under §§218.0125(3m)(b) and (c)(2) of the Act, Wisconsin dealers may elect to request reimbursement for the parts they install when performing warranty repairs at their average, nonwarranty percentage

markup determined in accordance with the Act. Id. at ¶31. Similarly, under those sections of the Act, Wisconsin dealers may elect to request reimbursement for the labor they provide when performing warranty repairs at their average effective nonwarranty labor rate, determined in accordance with the Act. Id. at ¶32. The statutory formula to calculate a dealer's effective nonwarranty labor rate under ¶§218.0125(3m)(c)(1) requires the defendant to divide the total amount the dealer charged its customers for labor by the flat rate hours allotted for the same repairs in the defendant's LTG—even if the dealer used a third-party LTG when it charged the customer for the underlying repair (the "Statutory Labor Rate"). Id. at ¶33. The defendant then must reimburse the dealer for warranty labor by multiplying the dealer's Statutory Labor Rate by the flat-rate time allotted by the defendant's LTG. Id. at ¶34.

At the time of the briefing, the defendant had approximately 125 authorized dealers in Wisconsin. Id. at ¶35. Approximately thirty-five of the defendant's Wisconsin dealers (including each of the plaintiffs) had requested parts reimbursement in accordance with the Act. Id. at ¶36. Because of their statutory requests, the defendant was reimbursing the plaintiffs for the parts they install when performing warranty repairs at markups ranging from 66% to 106% over dealer cost. Id. at ¶37. Approximately thirty of these Wisconsin dealers (including each of the plaintiffs except A-F Motors, Inc.) also had sought warranty labor reimbursement in accordance with the Act. Id. at ¶38. Because of those statutory requests, the defendant was reimbursing the

plaintiffs for the labor they provided when performing warranty repairs at the

following rates:

| Dealer | Prior Labor Rate | Current Labor Rate | 2016 Labor Hours |
|---|---|---|---|
| Don Johnson Hayward Motors, Inc. | $82.95 | $97.28 | 1,676.2 |
| Gross Motors Inc. | $93.74 | $107.56 | 2,744.6 |
| Gross Chevrolet-Buick-GMC Inc. | $95.01 | $104.02 | 2,876.8 |
| Broadway Automotive-Green Bay Inc. | $104.72 | $108.36 | 10,669.7 |
| Toycen of Laydsmith Inc. | $106.06 | $118.37 | 1,600.3 |
| Sleepy Hollow Chevrolet Buick GMC Inc. | $85.44 | $96.75 | 4,296.3 |
| Mike Shannon Automotive Inc. | $103.61 | $119.17 | 11,487.80 |
| Sheboygan Chevrolet Buick GMC Cadillac | $99.68 | $123.93 | 7,398.6 |
| Heritage Chevrolet, Inc. | $100.23 | $105.87 | 1,711.9 |
| Kocourek Chevrolet, Inc. | $95.52 | $129.62 | 5,440.9 |
| Klein Chevrolet Buick, Inc. | $89.82 | $120.15 | 2,746.4 |

Id. at ¶39.[1]

---

[1]In its brief in support of its motion for summary judgment, the defendant provided this same chart, but added a fourth column of numbers under the heading "Projected Annual Labor Cost Increase." Dkt. No. 19 at 10. As far as the court can tell, to come up with the numbers in this fourth column, the defendant first multiplied the "Prior Labor Rate" by the "2016 Labor Hours." It then multiplied the "Current Labor Rate" by the "2016 Labor Hours." Finally, it subtracted the product of the first calculation from the product of the second, and rounded off the result for a "Projected Annual Labor Cost Increase." It also added a row at the bottom of the chart, entitled "Total;" in the final column

In a letter dated September 21, 2016, the defendant notified its Wisconsin dealers receiving (or requesting) warranty reimbursement under the Act that the defendant would begin adding a surcharge to invoices of any new vehicle purchased by those dealers, to recoup GM's alleged increased warranty reimbursement costs. Id. at ¶¶40, Dkt. No. 15-3 ("Exhibit C"). The proposed surcharge would be a uniform amount, applied solely to new vehicles sold to Wisconsin dealers that have requested statutory reimbursement. Id. at ¶42. The defendant planned to calculate the *parts* component of the cost recovery surcharge by "aggregating the total estimated amount of increased warranty parts reimbursement it is required to pay to dealers in Wisconsin requesting warranty parts reimbursement under the Act," then dividing that amount by the projected number of vehicles that will be purchased by those dealers. Id. at ¶43. The initial amount of the surcharge to be applied to Wisconsin dealers requesting only warranty parts reimbursement under the Act would be $219. ¶44. The defendant planned to calculate the *labor* component of the cost recovery surcharge by "aggregating the total estimated amount of increased warranty labor reimbursement it is required to pay to Wisconsin dealers requesting warranty labor reimbursement under the Act," then dividing that amount by the projected number of vehicles that will be purchased by those dealers. Id. at ¶45. The initial amount of the surcharge to be applied to Wisconsin dealers requesting *both* warranty parts *and* warranty labor

---

under "Projected Annual Labor Cost," it totaled the "Projected Annual Labor Cost" for all of the plaintiffs.

reimbursement under the Act will be $389. Id. at ¶46. The defendant offered to any Wisconsin dealer that was already receiving statutory parts or labor reimbursement the opportunity to revert to that dealer's contract rate, to avoid the cost recovery surcharge in the future. Id. at ¶47.

## II.    Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure mandates that a court "shall" grant summary judgment if a moving party shows that there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56. See also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be disputed or is genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

Here, the parties have stipulated to the facts. Dkt. No. 15. They dispute only the legal issue, and they frame that legal issue in different ways.

### III. **Legal Analysis**

#### A. The Issue Before the Court

The plaintiff dealers have asked the court "for a declaration that the warranty cost recovery surcharge which the defendant . . . plans to impose on vehicles the [plaintiffs] purchase from [the defendant] violates Wis. Stat. § 218.0125." Dkt. No. 17 at 1. They assert that "[t]he sole issue currently presented by this case is whether the Wisconsin legislature intended to permit manufacturers to recover some or all of the increased amounts they are required to pay dealers electing to be compensated for warranty work under Wis. Stat. § 218.0125 by selectively surcharging those same dealers[.]" Id. at 9. They characterize the issue as a "simple question of statutory construction," and argue that the answer to their question is that the legislature did not intend for manufacturers to recover the compensation through a surcharge. Id.

The defendant says that the "sole issue before the Court is whether Wisconsin law *affirmatively precludes* [the defendant] from increasing the prices of vehicles it sells to Wisconsin dealers that have demanded enhanced statutory warranty reimbursement in order to offset the additional warranty

expense associated with those vehicles." Dkt. No. 21 at 4 (emphasis in the original). It poses the question this way: "may [the defendant] recover its increased warranty reimbursement costs in Wisconsin by increasing the price of vehicles it sells *only* to those Wisconsin dealers that have demanded enhanced statutory warranty reimbursement?" Dkt. No. 19 at 6 (emphasis in the original). Not surprisingly, the defendant urges the court to answer this question in the affirmative.

Neither the Seventh Circuit nor any Wisconsin court has addressed the issue.

B.    Jurisdiction

The parties have asked the court to interpret a Wisconsin statute. This court's jurisdiction to entertain that request is grounded in diversity; the plaintiffs are Wisconsin citizens, the defendant a citizen of Delaware, and the plaintiffs allege that if the court rules in the defendant's favor, they will suffer losses of over $75,000. Dkt. No. 1 at ¶¶15-16. See 28 U.S.C. §1332.

The court notes that the defendant has not raised the prices it charges the plaintiffs for new vehicles. The plaintiffs have sued because the defendant said that it was *going* to raise the prices it charged dealers who had requested statutory compensation, as of a date certain. The defendant has not challenged the plaintiffs' standing, and the fact that the defendant said that it would take specific action, on a specific date, against specific dealers (as well as its continuing statement of intent through this suit to implement the "cost recovery" program) was a real and immediate threat of injury sufficient to

constitute an actual case or controversy. See, *e.g.*, <u>Whitmore v. Arkansas</u>, 495 U.S. 149, 155 (1990) (harm must be "actual or imminent"); <u>City of Los Angeles v. Lyons</u>, 461 U.S. 95, 101-102 (1983) (plaintiff must show that he is "immediately in danger of sustaining some direct injury").

    C.    <u>Analysis</u>

        1.    *The Rules of Statutory Construction*

Because jurisdiction is based on diversity, the court must interpret the law as it thinks the Wisconsin courts would. <u>Winebow, Inc. v. Capitol-Husting., Inc.</u>, 867 F.3d 862, 868 (7th Cir. 2017). Wisconsin courts begin with the text of the statute. <u>Id.</u> When the meaning is clear from the text, the "inquiry *ordinarily* ends." <u>Teschendorf v. State Farm Ins. Cos.</u>, 717 N.W.2d 258, 263 (Wis. 2006). Where statutory language is unambiguous, there is no need to consult extrinsic sources of interpretation, such as legislative history. <u>State *ex rel.* Kalal v. Circuit Court for Dane Cty.</u>, 681 N.W.2d 110, 124 (2004). In looking for the plain meaning of a statute, the court considers "the role of the relevant language in the entire statute," <u>Teschendorf</u>, 717 N.W.2d at 263 (quoting <u>Landis v. Physicians Ins. Co. of Wis., Inc.</u>, 628 N.W.2d 893, 899 (Wis. 2001)), considering the "context in which words appear, the structure of the statute, and the purpose of the statute where it is evident from the statutory text," <u>id.</u> (citing <u>Kalal</u>, 681 N.W.2d 110 at 124).[2]

---

[2] In <u>State v. Delaney</u>, decided the year before <u>Kalal</u> and three years before <u>Teschendorf</u>, the Wisconsin Supreme Court said, "Only when statutory language is ambiguous may we examine other construction aids such as legislative history, scope, *context, and subject matter.*" <u>State v. Delaney</u>, 658

If a statute is ambiguous, the court must continue its inquiry. "A statute is ambiguous if reasonable persons could disagree as to [the statute's] meaning." State v. Delaney, 658 N.W.2d 416, 420 (Wis. 2003). "[A] statute is ambiguous if it is capable of being understood by reasonably well-informed persons in two or more senses." Kalal, 681 N.W.2d at 124 (citing Bruno v. Milwaukee Cty., 660 N.W.2d 656, 661 (Wis. 2003)). In a case like this one, however, where "it is obvious that people disagree as to the meaning to be given a statute," the disagreement alone "cannot be controlling." Nat'l Amusement Co. v. Wis. Dept. of Taxation, 163 N.W.2d 625, 628 (Wis. 1969). "The court should look to the language of the statute itself to determine if 'well-informed persons' should have become confused." Id.

The Wisconsin Supreme Court has held that it looks "outside the statute" in three situations: (1) where, after considering all "intrinsic sources," the meaning of the statute is ambiguous; (2) where the statute's meaning is plain, but the Court wishes to "contribute to an informed explanation that will firm up statutory meaning," and thus looks to the legislative history; and (3) where the meaning appears plain, but that plain meaning would produce absurd results. Teschendorf, 717 N.W.2d at 263.

_____

N.W.2d 416, 419-20 (Wis. 2003). The Kalal Court cited Delaney for the proposition that "statutory language is interpreted in the context in which it is used; not in isolation but as part of a whole; in relation to the language of surrounding or closely-related statutes; and reasonably, to avoid absurd and unreasonable results." Kalal, 681 N.W.2d at 124. Teschendorf made no reference to Delaney, but cited Kalal.

## 2. *The Language of the Statute*

As Wisconsin law requires, the court begins with the language of the statute, Wis. Stat. §218.0125. Section 218.0125(3m)(a) requires that a manufacturer "reasonably compensate" a qualifying dealer who performs work "to rectify the product or warranty defects of the manufacturer," or "to satisfy delivery and preparation obligations of the manufacturer," or for "any other work required, requested, or approved by the manufacturer, importer, or distributor or for which the manufacturer, importer, or distributor has agreed to pay."

"Reasonable compensation" for dealers who request compensation based on work performed means compensation

> equal to the dealer's effective nonwarranty labor rate multiplied by the number of hours allowed for the repair under the manufacturer's, importer's, or distributor's time allowances used in compensating the dealer for warranty work. Reasonable compensation under par. (a) for parts is equal to the dealer's cost for the parts multiplied by the dealer's average percentage markup over dealer cost for parts.

Wis. Stat. §218.0125(3m)(b).

"Reasonable compensation" for dealers who request compensation based on having received 100 sequential repair orders is calculated as follows:

> using the submitted substantiating orders under sub. (4m)(a)2., by dividing the total customer labor charges for qualifying nonwarranty repairs in the repair orders by the total number of hours that would be allowed for the repairs if the repairs were made under the manufacturer's, importer's, or distributor's time allowances used in compensating the dealer for warranty work.

Wis. Stat. §218.0125(3m)(c)(1). Section 218.0125(3m)(c)(2) defines "average percentage markup over dealer cost for parts" in the repair orders context as

the dealer's "total charges for parts in the repair orders" divided by "the total dealer cost for parts." Wis. Stat. §218.0125(3m)(c)(2)

The application of the statute is not automatic; it applies only to qualifying dealers. To qualify for the statutory compensation, the dealer must submit to the manufacturer (1) a written notice of the claimed effective nonwarranty labor rate or average percentage markup over dealer cost for parts, and (2) either 100 sequential repair orders for qualifying nonwarranty repairs, or all repair orders for qualifying nonwarranty repairs performed in a ninety-day period, whichever is less. Wis. Stat. §218.0125(4m)(a).

### 3. *What the Statute Requires*

According to the defendant, "the plain language of the statute . . . does not prohibit, limit, restrict or even address the manner in which manufacturers may increase vehicle prices." Dkt. No. 19 at 13. They argue that the statute is "silent regarding wholesale vehicle prices," and that "[f]or that reason alone," they are entitled to summary judgment.

This "plain language" argument is a red herring. True, the statute does not say that manufacturers cannot raise their prices. It does not say that they cannot recover their costs. It does not say that they cannot charge dealers who request compensation more than dealers who do not. There are many things the statute does not say. That is not, in the court's view, the issue. The issue is whether the defendant's "cost recovery" program constitutes a violation of what the statute *does* say.

Section 281.0125 is titled "Warranty reimbursement." The court is mindful of the Seventh Circuit's admonition that, for many reasons, "dictionaries must be used as sources of statutory meaning only with great caution." United States v. Costello, 666 F.3d 1040, 1043-1046 (7th Cir. 2012). Here, however, Merriam-Webster's definition of "reimburse" as a transitive verb meaning "to pay back to someone," with a secondary definition of "to make restoration or payment of an equivalent to," https://www.merriam-webster.com/dictionary/reimburse, seems to fit.

After defining terms, the statute section explains that, "for the protection of the buying public," manufacturers must make sure that, before they deliver a new vehicle to a retail purchaser, they have "specified the delivery and preparation obligations" of the dealers. Wis. Stat. §218.0125(2). The statute requires the manufacturer to make these specifications in writing, and to file a copy with the Department of Transportation. Id. Those specs "shall constitute the dealer's only responsibility for product liability as between the dealer and the manufacturer . . . ." Id. That means that any "mechanical, body, or parts defects arising from any warranties of the manufacturer . . . shall constitute the *manufacturer's* . . . product or warrant liability." Id. (emphasis added).

So—the dealer is responsible for any delivery and preparation obligations that the manufacturer specifies in writing, while the manufacturer is responsible for mechanical, body and parts defects. Given that, it makes sense that Wis. Stat. §218.0125(3m) would require the *manufacturer* to compensate a dealer who repairs product or warranty defects that are the responsibility of the

*manufacturer.* The statute doesn't require the manufacturer to compensate any dealer who undertakes repairs or obligations that are the responsibility of the manufacturer. It mandates compensation from the manufacturer only when the dealer asks for it in writing, and demonstrates that within the six months before making the request, the dealer had a significant number of such repair orders or repairs—100 sequential repair orders, or all the repair orders the dealer actually performed within ninety days, whichever is less.
But for those dealers who qualify, and who ask, the statute requires the manufacturer to bear the cost.

Perhaps more relevant to the issue in dispute, the statute mandates that when a dealer qualifies, the manufacturer must "reasonably compensate" that dealer. Wis. Stat. §218.0125(3m). The court does not have to resort to a dictionary to find out what "reasonably compensate" means; the statute defines the phrase. "Reasonable compensation" for labor is the dealer's effective nonwarranty labor rate times the number of hours that the dealer's time allowances provide for nonwarranty work. "Reasonable compensation" for parts is the dealer's cost for the parts times the dealer's average percentage markup over the dealer cost for parts. Wis. Stat. §218.0125(3m)(b). The statute even defines "average percentage markup," and "effective nonwarranty labor rate." Wis. Stat. §218.0125(3m)(c)(1) and (2).

The "plain language" of the statute, then, requires manufacturers to pay qualifying dealers "reasonable compensation" for performing repairs that are the manufacturer's responsibility, and it precisely and specifically defines

"reasonable compensation." The issue is not whether the statute says that the defendant cannot do what it proposes to do. The issue is whether what the defendant proposes to do would violate that "plain language."

4.     *"Reasonable Compensation"*

According to the plaintiffs, if a manufacturer can surcharge qualifying and requesting dealers to recoup the cost of the "reasonable compensation," those dealers won't receive the "reasonable compensation" provided by the plain meaning of the statute. Dkt. No. 17 at 10.

Citing cases from other courts in other districts, the defendant first asserts that it is "quite commonplace" for manufacturers to pass on to retailers and consumers the costs of complying with regulatory statutes. Dkt. No. 19 at 13 (citing Acadia Motors, Inc. v. Ford Motor Co., 44 F.3d 1050, 1056 (1st Cir. 1995)). The defendant argues that it is doing nothing more than what an economically rational actor would do—recovering costs through price increases. Id. at 13-14. This argument strikes the court as irrelevant. The question is not whether manufacturers want to be able to recoup the cost of complying with Wis. Stat. §218.0125—one would assume that they do. The question is whether the statute allows them to.

More relevant to the plaintiff's argument is the defendant's response that its price increase isn't based on the amount of statutory compensation each dealer receives. Dkt. No. 19 at 13. Rather, the price increase is based on how many new cars the compensated dealer purchases.

The defendant proposes to increase its prices for the dealers who have sought compensation by an amount certain, and it explains how it is going to calculate that amount certain. The price increase will have both a labor component and a parts component—just like the statute does. Dkt. No. 19 at 11-12.

Under the statute, to figure out the "reasonable compensation" for a qualifying dealer who seeks compensation for performing nonwarranty labor, one must multiply the dealer's effective nonwarranty labor rate by the number of hours allowed for the repair under the manufacturer's time allowances used to compensate the dealer for warranty work. Wis. Stat. §218.0125(3m)(b). The defendant proposes to calculate the labor component of its price increase "by aggregating the total estimated amount of increased warranty labor reimbursement it is required to pay to Wisconsin dealers requesting warranty labor reimbursement under the Act and then dividing that amount by the projected number of vehicles that will be purchased by those dealers." Dkt. No. 19 at 12.

To calculate the "reasonable compensation" for a qualifying dealer who seeks compensation for nonwarranty parts, the statute requires that one multiply the dealer's cost for the parts by the dealer's average percentage markup over dealer cost for those parts. Wis. Stat. §218.0125(3m)(b). The defendant proposes to calculate the parts component of its price increase "by aggregating the total estimated amount of increased warranty parts reimbursement it is required to pay dealers in Wisconsin requesting warranty

parts reimbursement under the Act and then dividing that amount by the projected number of vehicles that will be purchased by those dealers." Dkt. No. 19 at 11.

The defendant has indicated that it will charge an "initial" price increase of $219 per vehicle for those dealers who request compensation for parts only, and $389 for those dealers requesting compensation for parts and labor. Id. at 11-12. The defendant asserts that it is tying the price increase to the number of vehicles the dealer purchases from the defendant, "not the amount or frequency of its warranty activity." Dkt. No. 21 at 7-8. The defendant also notes that dealers can control how frequently they buy new GM vehicles, and how many they buy, as well retail prices charged to customers. Id. at 8. The defendant also notes that it offered to allow any dealer who already was receiving compensation "to revert to the parties' contract rate"—in other words, to stop taking advantage of the statutory compensation—"in order to avoid the price increase." Dkt. No. 19 at 12.

Will the proposed price increase based on the number of new vehicles a dealer buys effectively reduce the "reasonable compensation" received by the dealers who request it? For those dealers who, in the face of the proposed price increase, accept the defendant's offer to revert to the contract rate, the answer is no. Reverting to the contract price would be their prerogative. The statute does not require a dealer to seek compensation—whether to do so is the dealer's choice.

For those dealers who continue to seek statutory compensation, the court believes that the answer also is no, although it is more complicated. Take plaintiff Don Johnson Hayward Motors, Inc. as an example. According to the stipulated facts, at a labor rate of $97.28 and a predicted 1,676.2 labor hours in a year, the dealer would be entitled to $163,060.73 in labor reimbursement for that year. Dkt. No. 15 at ¶39. Under the defendant's proposed "cost recovery" plan, that is the amount the defendant would pay the dealership. It is the same amount the defendant would have paid the dealership absent the "cost recovery" plan's implementation. But if the dealership purchased twenty-five new cars after implementation of the "cost recovery" plan, it would pay $9,725[3] more for those cars than the GM franchisee in the next town that did not seek reimbursement.

The increased cost would impact the dealership's bottom line. It might require the dealership to charge its customers a higher retail price, or cause it to cut costs to avoid retail price increases. But it is a stretch to say that this kind of indirect impact mandates the conclusion that the cost recovery program denies dealers the "reasonable compensation" required by the plain language of the statute.

5.    *Other Decisions Construing Similar Statues and Plans*

Perhaps the court's conclusion above should be the end of the discussion. The defendant's "cost recovery" plan does not violate the plain

---

[3] This number assumes a price increase of $389 per vehicle, which is the price increase the defendant proposes for both the parts and labor component.

language of the statute requiring manufacturers to "reasonably compensate" those qualifying dealers who request such compensation. But because no Wisconsin state or federal court has addressed whether a manufacturer's cost recovery surcharge violates Wis. Stat. §218.0125, the parties both urge the court to consider how other courts have looked at similar plans in relation to similar statutes in other states.

For example, the state of Maine had a statute that required a franchisor to compensate franchisees for parts at the franchisee's retail cost. <u>Acadia Motors v. Ford Motor Co.</u>, 44 F.3d 1050, 1052 (1st Cir. 1995). To recover the cost of this statutory requirement, Ford increased the sticker price of every car it sold in the state by $160. <u>Id.</u> at 1052-53. In upholding the surcharge, the First Circuit stated that "[n]othing in the language [of the statute] prohibits a manufacturer from increasing vehicle prices in order to recover its increased compliance costs." <u>Id.</u> at 1056. The court reasoned that because "statute says nothing about wholesale or retail prices," it "leaves the manufacturer free to increase wholesale prices, and the dealer to increase retail prices." <u>Id.</u>[4]

That is the reasoning the defendant has employed here; as the court noted above, it found that argument less compelling than did the First Circuit.

A similar New Jersey statute required manufacturers to reimburse its dealers for parts used in warranty repairs at the dealers' prevailing retail price,

---

[4] The Maine statute subsequently was amended to prohibit manufacturers from adding state-specific surcharges to wholesale motor prices in order to recoup the costs of their compliance with retail-rate reimbursement statutes. <u>Alliance of Auto. Mfrs. v. Gwadosky</u>, 430 F.3d 30, 32 (1st Cir. 2005).

which was higher than the provisions in the standard dealer agreements.

Liberty Lincoln-Mercury v. Ford Motor Co., 676 F.3d 318, 321-22 (3d Cir.

2012). In New Jersey,

> Ford [had] calculated, for each New Jersey dealer, the cost of
> increased warranty reimbursements due to the higher retail
> reimbursement rate, and then divided that total by the number
> of wholesale vehicles purchased by that same dealer. That
> amount constituted the surcharge added to the wholesale price
> of every vehicle purchased by that specific dealer.
> Consequently, the wholesale vehicle surcharge a dealer faced
> would increase in direct proportion to the amount of warranty
> claims the dealer submitted.

Id. at 322. Franchise dealers sued, and the district court concluded that that

cost recovery plan violated the New Jersey statute. Id. (citing Liberty Lincoln-

Mercury, Inc. v. Ford Motor Co. (Liberty I), 923 F. Supp. 665, 667-70 (D.N.J.

1996), aff'd in part, 134 F.3d 557, 564 (3d Cir. 1998) (Liberty II)). So, Ford

devised a new plan—it calculated how much it cost for Ford to comply with the

New Jersey statute, and divided that by the total number of cars it sold in the

state. It imposed the resulting number as a "flat surcharge for every wholesale

vehicle sold in the State, rather than a surcharge that varied across dealers."

Id. So—the more cars a New Jersey dealer bought, the more flat surcharges it

paid, regardless of how many warranty repair reimbursements it received. Id.

The dealers challenged this new plan. The district court concluded that

the new plan also violated the statute. Id. The Third Circuit disagreed. Like the

First Circuit in Acadia, the Third Circuit concluded that the New Jersey statute

"permit[ted] cost-recovery systems using bona fide wholesale price increases,"

because the statute did not "impose limitations on wholesale vehicle

transactions." Id. at 324. The court held that because the new Ford plan was a "flat surcharge assessed on all wholesale vehicles sold within the State," and depended on the number of cars a dealer sold and not the number of statutory reimbursements, the new plan was not subject to regulation under the New Jersey statute. Id. at 325.

The plaintiffs point out that the Third Circuit had rejected Ford's first crack at a New Jersey cost-recovery plan—the one where it took an individual dealer's warranty reimbursement costs and divided it by the number of cars that dealer invoiced in that month. Liberty II, 134 F.3d at 565. While the court found that the New Jersey statute did not "preclude cost-recovery systems effected through wholesale vehicle price increases," it concluded that Ford's plan was not such a system. Id. at 564. The Third Circuit found it critical that Ford based its first plan on the number of reimbursements each dealer received, finding that "[w]hen a dealer incurs financial burdens upon making a retail-rate warranty reimbursement claim, the dealer, in effect, is compensated for the warranty transaction at a below-retail rate, which the [New Jersey] statute forbids." Id. at 564-65. The court compared that to a plan in which a dealer "incurs financial burdens as a result of other transactions;" under that kind of plan, the court found, "those [financial] burdens may reduce the return the dealer receives on those transactions, but the terms of those transactions are unregulated. Therefore the decreased compensation associated with those transactions does not violate the statute as does a below-retail rate of compensation for installing warranty parts." Id. at 565.

The Third Circuit's reasoning as to Ford's first New Jersey plan is a bit like the court's reasoning as to the defendant's Wisconsin plan. It is hard to characterize the defendant's proposed price increase as a reduction in the dealers' statutorily-mandated reasonable compensation; while it imposes a financial burden on the dealers for buying new vehicles wholesale, the result is a reduction in the dealer's return on the subsequent retail sale, not a reduction in the reasonable compensation.

6.    *The Fairness Argument*

There is a difference between Wisconsin's statute and the Maine and New Jersey statutes. The Maine and New Jersey statutes required manufacturers to reimburse *all* dealers at the retail rate for parts. Dealers did not have to ask for reimbursement; every dealer in the state received reimbursement under the statute, whether they sought it or not. Dealers did not "opt in" to the more costly reimbursement. In Wisconsin, a dealer gets the more costly compensation only if the dealer asks for it.

There is a related difference between the plans the First and Third Circuits approved and the defendant's proposed Wisconsin plan. The plans those courts approved increased wholesale prices on all cars purchased by all dealers; the defendant's Wisconsin plan surcharges only those cars purchased by dealers who elect to receive statutory compensation.

Looking at these two facts from one perspective, one could argue that the defendant's Wisconsin plan is identical in principle to the Ford plans approved in Acadia and Liberty II; it recoups costs by increasing wholesale prices (as the

24

plaintiffs have conceded it is entitled to do, dkt. no. 17 at 8) for all dealers responsible for the defendant's increased costs, and it does so without regard to how many times they perform repairs or how much statutory compensation they receive.

Viewed from another perspective, the defendant's Wisconsin plan raises wholesale prices only for those dealers who qualify for, and exercise their right to request, statutory compensation. Looking at the situation from this angle, one has a sense that there is something "unfair" about this—that dealers like the plaintiffs, who have done nothing more than what the law allows them to do, are being "punished" by having to pay higher prices for the defendant's vehicles than dealers who elected not to avail themselves of the compensation provided by §218.0125(3m).

The plaintiffs go further, arguing that the plan discriminates among dealers. They argue that in cases where a dealer buys lots of cars, but does not do a lot of warranty word or receive much warranty compensation, the surcharge "*penalizes* the dealer for exercising its statutory right by 'an offsetting debit' that *exceeds* the increased compensation it receives under the statute," and characterize this as "discrimination." Dkt. No. 17 at 14. They illustrate this possibility in their reply brief, describing four hypothetical deals, each receiving a different amount of compensation, each purchasing a different number of vehicles. Dkt. No. 22 at 8. The hypothetical dealer who receives $400,000 in warranty compensation and buys 1,250 new cars would be subject to a $312,500 surcharge; that dealer would end up receiving $87,500

more in warranty compensation than it would pay in surcharges. In contrast, a dealer who received only $200,000 in warranty compensation and purchased only 1,000 new cars would be surcharged $250,000, and would end up receiving $50,000 *less* in warranty compensation that it pays in surcharges. These hypotheticals, the plaintiffs argue, demonstrate that the defendant's plan violates the statute, by providing less than reasonable compensation to some dealers.

This is an argument that the defendant's plan is not *fair*, in the generic sense of the word. As the court already has discussed, the first dealer will receive the $400,000 in reasonable compensation to which it is entitled under the statute. The second dealer will receive the $200,000 in reasonable compensation to which it is entitled under the statute. The new vehicle purchase patterns of the two dealers are different, and will result in different surcharges and different impacts on their bottom lines. But it does not follow that the plan violates the Wisconsin statute; both dealers receive the reasonable compensation the statute requires.

The plaintiffs also present a sort of "slippery slope" argument, predicting the impact the defendant's plan will have. They argue that if the defendant's plan goes into effect, "the only economically rational choice for the dealers who pay more in surcharges than the increased warranty compensation they receive under § 218.0125 will be to relinquish their statutory rights and accept the rates offered by [the defendant.]" Id. at 9. They speculate that eventually the only dealers who will be subject to the surcharge are the dealers whose

26

statutory compensation exceeds their wholesale purchase surcharges, and *voila!*—the defendant's Wisconsin surcharge will be directly linked to the amount of compensation those dealers receive, just like the plan the Third Circuit struck down in <u>Liberty I</u>. <u>Id.</u>

This argument is speculative, and the reasoning does not necessarily follow. Even if the only dealers subject to the surcharge are dealers who do so much warranty work that their reasonable compensation for that work exceeds the surcharge they pay on new vehicle purchases, they still would be receiving the reasonable compensation required by the statute. While they would suffer a decrease to their bottom line, that decrease still would result from the number of new vehicles purchased, and would not be a deduction from the reasonable compensation.

### 7. *Summary*

It may be that "[s]omething is rotten in the state of Denmark."[5] There may be something problematic with the defendant's plan to increase wholesale car prices only for those dealerships that receive compensation under §218.0125. The plaintiffs have reserve the right to challenge the plan in other ways, if the court rules against them on this challenge. Dkt. No. 17 at n.3. The court cannot predict how it would rule on any other challenge to the proposed plan. The court rules only on the claim that the plan violates §218.0125, and finds that it does not.

---

[5] WILLIAM SHAKESPEARE, HAMLET act 1, sc. 4.

The parties have not addressed the merits of Counts Three and Four. The parties agreed that the plaintiffs would have the right to file an amended complaint within twenty days after the court issued this ruling, "which Amended Complaint may raise other claims for relief arising out of the proposed charges set forth and described in Complaint Exhibit 1, to the extend they are not resolved by the opinion and order." Dkt. No. 12 at 2. The court approved that stipulation. Dkt. No. 13 at 2. The court will allow the plaintiffs that time to file the amended complaint.

## IV. Conclusion

The court **DENIES** the plaintiffs' motion for summary judgment, dkt. no. 16, and **GRANTS** the defendants' motion for summary judgment on Counts One and Two, dkt. no. 18. The court **ORDERS** that the plaintiffs shall file an amended complaint within twenty days of the date of this order.

Dated at Milwaukee, Wisconsin, this 24th day of September, 2018.

**BY THE COURT:**

_____

**HON. PAMELA PEPPER**
**United States District Judge**